IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 05-cv-00373-RPM
(Consolidated with 05-cv-00374 and 05-cv-00835)

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON
WHO SUBSCRIBED POLICY NO. 150;
VALLEY FORGE INSURANCE COMPANY,
a Pennsylvania insurance company; and
ZURICH AMERICAN INSURANCE COMPANY,
successor in interest to Zurich Insurance Company (U.S. Branch),

      Plaintiffs,

v.

HEALTH CARE MANAGEMENT PARTNERS, LTD.,
d/b/a O'HARA REGIONAL CENTER FOR REHABILITATION,
a limited partnership;
ORCR, INC.,
d/b/a O'HARA REGIONAL CENTER FOR REHABILITATION, INC.,
a corporation;
O'HARA REGIONAL CENTER FOR REHABILITATION, INC.,
business form unknown;
SOLOMON HEALTH MANAGEMENT, LLC,
d/b/a SOLOMON HEALTH SERVICES, LLC,
a limited liability company;
HERSCH "ARI" KRAUSZ;
DAVID SEBBAG; and
V. ROBERT SALAZAR, individuals; and
CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,
subscribing to Policy No. 0150,

      Defendants.

## ORDER ON MOTIONS

The plaintiffs Certain Underwriters at Lloyd's, London Who Subscribed Policy No. 0150 ("Lloyd's"), Valley Forge Insurance Company ("Valley Forge"), and Zurich American Insurance

Company ("Zurich") (collectively, "Insurers") filed their respective complaints seeking declaratory relief against the defendants Health Care Management Partners, Ltd. d/b/a O'Hara Regional Center for Rehabilitation ("Health Care Management"), ORCR, Inc., d/b/a O'Hara Regional Center for Rehabilitation, Inc. ("ORCR"), O'Hara Regional Center for Rehabilitation, Inc. ("O'Hara")[1], [2] Solomon Health Management, LLC d/b/a Solomon Health Services, LLC ("Solomon"), Hersch "Ari" Krausz ("Krausz"), David Sebbag ("Sebbag"), and V. Robert Salazar ("Salazar") (collectively, "Defendants"). The Insurers seek a declaratory judgment that their respective insurance policies do not provide coverage for the claims asserted against the Defendants in an action entitled <u>United States of America and the State of Colorado v. Health Care Management Partners, Ltd. (HCMP), d/b/a O'Hara Regional Center for Rehabilitation, a limited partnership; ORCR, Inc., d/b/a O'Hara Regional Center for Rehabilitation, Inc., a corporation; Solomon Health Management, LLC (Solomon) d/b/a Solomon Health Services, LLC, limited liability companies; Hersch "Ari" Krausz; David Sebbag; and V. Robert "Rob" Salazar, Individuals,</u> Civil Action No. 04-cv-02340-REB-BNB, U.S. District Court for the District of Colorado ("Underlying Lawsuit").

Valley Forge and Zurich also seek reimbursement for defense costs they have expended, and are continuing to expend, in providing a defense for the Defendants in the Underlying Lawsuit, subject to a reservation of rights. The Defendants filed counterclaims for bad faith against Valley Forge and Lloyd's. By order dated June 24, 2005, the Insurers' actions against the

---

[1] O'Hara Regional Center for Rehabilitation, Inc., business form unknown, was named as a defendant only by Valley Forge.

[2] Health Care Management, ORCR, and O'Hara will be referred to collectively as "O'Hara."

Defendants were consolidated. Subject matter jurisdiction is claimed and found pursuant to 28 U.S.C. § 1332.

The Insurers moved for summary judgment declaring that they owe no duty to defend or indemnify the Defendants in the Underlying Lawsuit. Valley Forge and Lloyd's also seek dismissal of the Defendants' claims for bad faith. Valley Forge and Zurich ask for a determination that they are entitled to reimbursement from the Defendants for defense costs expended on their behalf in the Underlying Lawsuit. The Defendants do not dispute that Valley Forge and Zurich have properly reserved their right to seek reimbursement for defense costs, but contend the Insurers have a duty to defend and moved for a summary judgment of that issue in their favor.

Under Colorado law, an insurer's duty to defend is broader than the duty to indemnify. If there is no duty to defend, there is no duty to indemnify. *E.g., TerraMatrix v. U.S. Fire Ins. Co.,* 939 P.2d 483, 486 (Colo.App. 1997). "An insurer has a duty to defend whenever the underlying complaint against the insured alleges any facts that might fall within the coverage of the policy." *Gerrity Co. v. CIGNA Prop. & Cas. Ins.*, 860 P.2d 606, 607 (Colo.App. 1993). The insurer's duty to defend is determined by the factual allegations in the underlying complaint; not the legal theories or claims alleged. *Id.* Accordingly, resolution of the parties' motions requires an examination of the pleadings in the Underlying Lawsuit and the Insurers' insurance policies. The affidavit of Lisa Souba, a "Certified Medical Practice Executive," submitted by the Defendants in their papers, is irrelevant and disregarded.

The United States and the State of Colorado filed their complaint and two amended complaints in Civil Action No. 04-cv-02340-REB-BNB:

<u>The allegations of the original Complaint.</u>  The original Complaint was filed on November 10, 2004.  The United States seeks to recover damages on behalf of the Department of Health and Human Services, and its operating division, the Centers for Medicare & Medicaid Services.  The Department of Health and Human Services provides funding for and regulates participation of long term care nursing facilities in the Medicare and Medicaid programs.  (Complaint, ¶3.)  The State of Colorado sues on behalf of its agency, the Colorado Department of Health Care Policy and Financing, which administers the Medicaid Program.  (Complaint, ¶4.)  (The United States and State of Colorado will be referred to collectively as the "Government.")

Medicare is a federal health insurance program, and Medicaid is a joint federal-state program in which the state pays health care providers for services to Medicaid recipients and receives the federal share of the payment from United States Treasury funds.  (Complaint, ¶¶16-17.)  The State has a Colorado Medicaid Hospital Back Up program for residents who require hospital-level services in a long-term care setting.  (Complaint, ¶32.)  Increased Medicaid *per diem* rates are paid to providers of services to those patients.  (*Id.*)

O'Hara was licensed by the State of Colorado as a Class V rehabilitation nursing facility to provide care to residents who required a substantially greater quantity and quality of skilled nursing care than that provided by ordinary nursing homes.  (Complaint, ¶¶5-6 & 18-19.)  O'Hara residents required a higher proportion of registered professional nurses ("RNs") and licensed practical nurses ("LPNs") than that provided by ordinary nursing homes.  (Complaint, ¶¶27, 33.)  Most residents were completely or partially dependent on O'Hara nursing staff for their activities

4

of daily living.  (Complaint, ¶28.)

O'Hara had provider agreements with Medicare and Medicaid and was required to adhere to applicable statutes and regulations as a prerequisite to receiving payments from the Medicare and Medicaid programs.  (Complaint, ¶¶21-26.)  O'Hara represented that it could provide a high level of services to its residents.  (Complaint, ¶¶29-30, 34.)  Medicaid paid O'Hara almost twice the reimbursement rate it paid for Medicaid residents residing in other long-term care nursing facilities in Colorado.  (Complaint, ¶31.)  Medicaid also paid O'Hara a daily payment rate of $525.51 for one Medicaid Hospital Back Up Patient for several years.  (Complaint, ¶100.)

During times relevant to the Complaint, Krausz and Sebbag were O'Hara's owners and managers.  (Complaint, ¶¶5, 6, 8, & 9.)  Salazar was an owner, officer, and manager for Solomon, a management company for long-term care nursing facilities, which had management agreements with O'Hara.  (Complaint, ¶¶7 & 10.)  Krausz and Sebbag also had ownership interests in Solomon.  (Complaint, ¶¶8-9.)  Solomon managed and operated O'Hara from January1, 1996 until June 2000.  (Complaint, ¶¶7 & 10.)  From June 2000 until December 31, 2000, Krausz and Sebbag directly managed O'Hara.  (Complaint, ¶¶ 8 & 9.)

Although O'Hara represented that it provided increased services, the Defendants "failed to employ enough nurses to provide all services required to care for and treat O'Hara's vulnerable residents."  (Complaint, p. 10; capitals omitted.)  "Defendants systematically and routinely understaffed O'Hara" so that "it was unable to provide sufficient nursing staff to meet the needs of O'Hara's patients or, in some instances, to provide even basic nursing care. . . ."  (Complaint, ¶11.)  The Defendants reduced nursing hours to save costs and terminated the use of temporary nurses to increase profitability.  (Complaint, ¶¶37 & 49.)  The failure to have an RN on duty

violated federal and state regulations and posed a serious hazard to O'Hara residents' health. (Complaint, ¶42.) Because "O'Hara was systematically and routinely understaffed, it did not provide the services for which the Defendants submitted claims to the Medicare and Medicaid programs," the O'Hara residents suffered, and the Defendants violated the standards they were required to meet. (Complaint, ¶¶56-58.)

After receiving complaints, the Colorado Office of Ombudsman conducted a review of care provided to O'Hara residents. (Complaint, ¶¶59-61.) The quality of care problems were caused by the short staffing at O'Hara. (Complaint, ¶61.) The Defendants did not increase nurse staffing or attempt to meet nursing needs, and further complaints were received, causing the Office of Ombudsman to file a complaint against O'Hara with the State Survey Agency, which determined whether a facility should continue to be certified to receive government funding. (Complaint, ¶¶62-64.)

The Defendants obscured the problems at O'Hara by engaging in a pattern and practice of falsifying information, such as temporarily increasing the nurse staffing to create the appearance that O'Hara was fully staffed. (Complaint, ¶¶68-71.) The Defendants submitted a false Plan of Correction to avoid being cut off from Medicaid and Medicare payments. (Complaint, ¶¶74-81.) O'Hara continued to be understaffed, and submitted false staffing reports to the State Survey Agency. (Complaint, ¶¶83-84.) Effective December 11, 2000, the Centers for Medicare and Medicaid Services terminated O'Hara's participation in the Medicare program. (Complaint, ¶86.)

Despite the fact that "care, goods or services were not provided, were inadequate or worthless, or . . . were provided at a time when Defendants' actions had forfeited their right to claim payment," Defendants submitted UB-92 claims for payment, "for each day of service for

6

each resident." (Complaint, ¶¶87, 88, 93, 98.)  Claims for payment to the Medicare and Medicaid programs were submitted falsely claiming that appropriate care was being provided on  each day of service claimed.  (Complaint, ¶98.)  This also occurred for one Medicaid Hospital Back Up patient, as Krausz represented that O'Hara could provide a stated number of nursing hours per day but did not ensure those hours were received or budget for those hours, resulting in substandard nursing care for the Hospital Back Up patient.  (Complaint, ¶¶100-103.)  Despite the understaffing of nursing services, the Defendants submitted or caused to be submitted payments for hospital level services that were not provided to the Hospital Back Up patient.  (Complaint, ¶104.)

Based on these factual allegations, the Government has pleaded the following claims against all the Defendants, except for the Eighth Claim which is directed against only the Corporate Defendants:

1) First Claim for Relief under the False Claims Act, alleging the Defendants presented false or fraudulent claim forms for reimbursement to the Medicare and Medicaid programs, for goods and services that they claimed were provided but they did not provide, were worthless or substandard, or were provided in violation of statutory and regulatory requirements, on the days as set forth in Exhibit A attached to the Complaint;

2) Second Claim for Relief under the False Claims Act, alleging the Defendants knowingly made or used false records or statements to get the false or fraudulent claims for services for the days listed in Exhibit A paid by the Medicare and Medicaid programs.  The Defendants' deception included false information concerning staffing levels at O'Hara;

3) Third Claim for Relief under the False Claims Act, alleging the Defendants presented

false or fraudulent claims for reimbursement to the State Medicaid program for the Hospital Back Up resident, for each day of substandard services;

4) Fourth Claim for Relief based on payment by mistake of fact, alleging the Government paid for services for O'Hara residents for the days listed in Exhibit A, and for all dates of service for the Hospital Back Up resident, based on the claims submitted by the Defendants, under the erroneous belief that Defendants' representations were accurate and represented reimbursable services;

5) Fifth Claim for Relief based on unjust enrichment, alleging the Defendants have been unjustly enriched by the monies received for services on the days listed in Exhibit A and for the services claimed for the Hospital Back Up resident to the Medicare and Medicaid programs;

6) Sixth Claim for Relief based on fraud, alleging the Defendants submitted false or fraudulent claims for the days listed in Exhibit A and for the services to the Hospital Back Up resident;

7) Seventh Claim for Relief based on restitution and disgorgement of illegal profits, imposition of constructive trust, and accounting, based on the Defendants' submission of false or fraudulent claims for payment to the Medicare and Medicaid programs for services and goods that were not rendered, inadequate or worthless, or rendered in violation of applicable statutes, regulations and guidelines; and

8) Eighth Claim for Relief for recoupment against the Corporate Defendants only, for monies paid by the Government to O'Hara.

The Government seeks recovery of statutory damages, civil penalties, damages, pre-judgment and post-judgment interest, costs, punitive damages, "other proper relief," and "[a]ll other legal and equitable relief."

Exhibit A is a table which identifies certain dates, gives a census for each date, and states the "RN Actual Hours" and "Total Direct Actual PPD [patient per day]" for those dates, for which the Government seeks damages.

<u>The allegations of the First Amended Complaint.</u>  The First Amended Complaint was filed on October 4, 2005 adding new allegations concerning the Defendants' failure to provide adequate therapy services and to have needed medical supplies and equipment on hand, which further limited or burdened the nursing staff's ability to provide care to O'Hara residents.  (First Amended Complaint, ¶¶45-46.)  The understaffing problems are allegedly the result of the Individual Defendants' deliberate management practices.  (First Amended Complaint, ¶59.)  A Ninth Claim for Relief based on negligent misrepresentation, directed against all Defendants, was added, alleging the Defendants negligently gave false information to the Government in support of the Medicare and Medicaid claims they submitted.

Exhibit A was amended.  The chart purports to identify the days on which the Defendants failed to provide 24 hour RN coverage and/or 5 hours of Direct Nursing Care Per Patient Per Day.  Additional days have been added.  Unlike the original Exhibit A, this chart places a check mark on the days where this alleged failure occurred instead of stating the exact number of nursing coverage or hours that were allegedly provided.  Based on the allegations in the First

9

Amended Complaint, the Government is requesting damages for each of the days identified.

<u>The allegations of the Second Amended Complaint.</u>  In addition to including most of the allegations contained in the original Complaint and the First Amended Complaint, the Second Amended Complaint alleges that the Defendants' design and implementation of policies at O'Hara "resulted in a systematic failure of care to its residents and the submission of false and fraudulent claims relating to the care for those residents to the Medicare and Medicaid program." (Second Amended Complaint, ¶11; *see also* ¶¶16-17).  The Defendants allegedly had a two-pronged plan to increase revenue: lower costs and overhead by reducing nursing and therapy staff while marketing to increase the number of residents.  (Second Amended Complaint, *e.g.,* ¶¶11, 157). "The chronic understaffing at O'Hara caused by these policies resulted in [the] systematic failure of care to the residents, and caused the submission of false and fraudulent claims relating to the care of those residents."  (Second Amended Complaint, ¶11.)  The Defendants knew "that O'Hara's residents required high levels of complex nursing care" and knew that high levels of services were necessary to meet the quality of care conditions set forth in the Medicare and Medicaid regulations (Second Amended Complaint, p. 13 [capitals omitted] & ¶¶45 & 47), but that "O'Hara's actual nursing staff was inadequate" (Second Amended Complaint, p. 16 [capitals omitted]; *e.g.*, ¶¶54-60 & 64), and understaffing led to substandard care.  (Second Amended Complaint, p. 19 &, *e.g.*, ¶87.)

The Medicare/Medicaid billing process is complex (Second Amended Complaint, *e.g.,* ¶¶10 &160), and the Individual Defendants' delegation of the function of filing claims to subordinates caused O'Hara to submit false claims.  (Second Amended Complaint, *e.g.*, ¶¶17, 40, 174 & 176.)  The Defendants' budget-based staffing model undermined O'Hara's ability to submit

10

valid claims to Medicare and Medicaid. (Second Amended Complaint, ¶159.) O'Hara submitted batch billings, and would submit claims for each day of service for the residents. (Second Amended Complaint, ¶163.)

"Medicaid paid a 'per diem' amount for each Medicaid resident." (Second Amended Complaint, ¶174.) Each Medicaid resident provided approximately $6,900 in revenue each month. (Second Amended Complaint, ¶122.) And a request for additional payments based on falsely inflated nursing hours was submitted, resulting in an additional $31.10 per day per Medicare resident being paid by Medicare for the January 1, 1998 through May 31, 1998 period. (Second Amended Complaint, ¶199.)

Although the First Claim for Relief based on the False Claims Act was unchanged, the Second and Third Claims for Relief, also based on the False Claims Act, are now directed only against the corporate Defendants O'Hara and Solomon. Similarly, the Fourth, Fifth and Seventh[3] Claims for Relief (payment by mistake of fact, unjust enrichment, and recoupment of overpayments, respectively) are also directed only against the corporate Defendants. The Sixth and Eighth[4] Claims for Relief (fraud and negligent misrepresentation, respectively) remain against all Defendants. The claim for restitution and disgorgement[5] was removed as a "claim" but added in the prayer for relief as part of the remedies sought.

Exhibit A, slightly modified, still serves as the primary basis for the Defendants' damages, and is based on the days in which the Defendants failed to provide 24 hours RN coverage and/or 5

---

[3] Formerly the Eighth Claim for Relief in the Complaint and First Amended Complaint.

[4] Formerly the Ninth Claim for Relief in the First Amended Complaint.

[5] Formerly the Seventh Claim for Relief in the Complaint and First Amended Complaint.

hours of Direct Nursing Care Per Patient Per Day.  (Second Amended Complaint, *e.g.,* ¶¶214, 218, 226, 232, 236.)

Zurich issued policies for the January 1, 1997 through January 1, 1998, and January 1, 1998 through January 1, 1999 policy periods.  Thereafter, Valley Forge issued policies for the January 1, 1999 through January 1, 2000 policy period, and Zurich issued one policy for the January 1, 2000 through January 1, 2001 policy period.  Those policies are as follows.

The Zurich policies.  Zurich issued a Health Care Commercial Umbrella Liability Policy, no. LPO 2731527 to Solomon Health Services, LLC as the named insured for the policy period of January 1, 1997 to January 1, 1998 ("1997 Umbrella Policy"), which provided umbrella coverage in excess of Zurich's Health Care Professional Liability and Commercial General Liability Policy, no. LPO 2731524, for the same policy period ("1997 Primary Policy").
Zurich issued another Health Care Commercial Umbrella Liability Policy, no. LPO 2731527-01 to Solomon Health Services, LLC as the named insured, for the policy period of January 1, 1998 through January 1, 1999 ("1998 Umbrella Policy"), which provided umbrella coverage in excess of Zurich's Health Care Professional Liability and Commercial General Liability Policy, no. LPO 2731524-01, for the same policy period ("1998 Primary Policy").

The 1997 and 1998 Primary Policies have been exhausted by payments to patients on claims of injury from substandard care.  This litigation concerns only the Umbrella Policies for those years and the Defendants are claiming only under the HPL Coverage parts of the Umbrella Policies.

The Coverage Part P-1 Hospital Professional Liability of the 1997 and 1998 Umbrella Policies provides, in relevant part:

> We will pay on behalf of any "insured" that portion of the "ultimate net loss" in excess of the "applicable underlying limit" that any "insured" becomes legally obligated to pay as damages because of injury to which this insurance applies. The injury must be caused by a "medical incident" that takes place during our policy period.

"Medical incident" is defined under the Umbrella Policies as:

> "Medical incident" means any act or omission in:
>
> (i)   the rendering or failing to render:
>
>       (a) medical, surgical, dental, x-ray, or nursing service or treatment, or the furnishing of food or beverage in connection therewith;
>
>       (b) any service or treatment conducive to health or of a professional nature; or
>
>       (c) any cosmetic or tonsorial service or treatment;
>
> (ii)  the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances;
>
> (iii) the postmortem handling of human bodies; . . .
>
> Any such act or omission, together with all related acts or omissions in the furnishing of or failing to furnish such services to any one person shall be considered as one "medical incident".

<u>The Valley Forge policies.</u>   Valley Forge issued a: 1) Resident Health Care Package Policy No. LHH P1 88950707 ("Resident Health Care Package Policy") to Solomon Health Services LLC as the named insured, for the policy period of January 1, 1999 though January 1, 2000, which included a Commercial General Liability Coverage Part ("CGL Coverage Part") and a Professional Liability Coverage Part ("PL Coverage Part"); and 2) Commercial Umbrella Plus Policy No. C188950741 ("Umbrella Policy") to Solomon Health Services LLC as the named

13

insured also for the same policy period. Because the policy limits under the Resident Health Care Package Policy have been exhausted by the payment of patient claims, coverage is sought under the Umbrella Policy. Valley Forge denies that its Umbrella Policy includes professional liability insurance coverage as claimed by the Defendants, and the Defendants assert that it should be reformed to correspond to the coverage in the PL Coverage Part of the Resident Health Care Package Policy. For purposes of Valley Forge's motion, it is assumed that the Defendants are correct in their contention. Accordingly, the coverage question is addressed in the language of the PL Coverage Part.

The "Resident Health Care Facility Professional Coverage Part" of the Resident Health Care Package Policy provides, in relevant part:

SECTION I - COVERAGE

RESIDENT HEALTH CARE FACILITY PROFESSIONAL LIABILITY

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of a "professional incident" in the course of performing professional services for your resident health care facility to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. . . .

* * *

SECTION V - DEFINITIONS
. . .

"Professional Incident" means:

Any act or omission in the furnishing or failure to furnish professional services including the furnishing of food, beverages, medications or appliances in connection with such services and the postmortem handling of human bodies.

<u>The Lloyd's policy.</u>  Lloyds issued a Commercial General/Health Care Professional Liability policy, Policy No. 0150 to, among others, Solomon Health Services, LLC and O'Hara Regional Center as the named insureds for the policy period of January 1, 2000 to January 1, 2001. The policy includes Health Care Professional Liability Part - Coverage D which provides, in relevant part:

    1.    Insuring Agreement - Individual Professional Liability

        a.    We will pay those sums that you become legally obligated to pay as damages because of injury to which this insurance applies. We will have the right and duty to defend you against any "suit" seeking those damages. However, we will have no duty to defend you against any "suit" seeking damages for injury to which this insurance does not apply.  . . .
. . .

        b.    This insurance applies to injury only if:

            (1)    The injury is caused by a "medical incident" that takes place in the "coverage territory"; and

            (2)    The injury occurs during the policy period; and

            (3)    The injury arises out of the individual insured's profession as a licensed health care provider.

    2.    Insuring Agreement - Partnership, Limited Liability Company, Association or Corporation Professional Liability

        a.    We will pay those sums that you become legally obligated to pay as damages because of injury to which this insurance applies. We will have the right and duty to defend you against any "suit" seeking those damages. However, we will have no duty to defend you against any "suit" seeking damages for injury to which this insurance does not apply.  . . .
. . .

        b.    This insurance applies to injury only if:

            (1)    The injury is caused by a "business entity incident" that takes place in the "coverage territory"; and

  (2)  The injury occurs during the policy period; and

  (3)  The injury is caused by any person for whose acts or omissions the professional partnership, limited liability company, association, or corporation, named in the Declarations, is legally responsible.

Section V - Definitions provides in relevant part:

2. "Business entity incident" means any act or omission arising out of the providing of or failure to provide professional health care services by [certain persons]. . . .

.

* * *

6. "Medical incident" means any act or omission:

  a. Arising out of the providing of or failure to provide health care services by:

    (1)  You; or

    (2)  Any person acting under the personal direction, control or supervision of you.

  . . . .

The Insurers have the common position that the relief claimed by the Government in the Underlying Lawsuit is based on factual allegations that do not fall within the insuring language of their policies because it was not "caused by a 'medical incident'" (Zurich), "because of a 'professional incident'" (Valley Forge), or "caused by" a "medical incident" or "business entity incident" (Lloyd's) (hereafter collectively referred to as "professional services"). The Insurers contend that all of the Government claims arise from or relate to business practices, not from medical incidents, professional incidents or business entity incidents. In deciding the motions now before the court, it is assumed that all of the Defendants would qualify as insureds under the applicable policies.

It is agreed that under applicable Colorado law, there is a duty to defend if any of the Government's claims are within the policy language. Therefore, the analysis must consider the complaints in their entirety rather than a separate determination as to each claim pleaded.

The Defendants raise three arguments as to why the allegations fall within the "professional services" provisions of the policies. First, that the Medicare and Medicaid billing process is complex and constitutes "professional services" for which there is professional liability coverage. Second, that the negligent design and implementation of health care practices is a "professional service" requiring special skill and knowledge. Third, that the claims arise from the alleged failure to provide "professional [nursing] services."

The Defendants' first argument is unavailing. Although the Government has alleged that the Medicare and Medicaid claims submission process is complex and requires numerous steps to complete, that is a business process, not a "professional service" within the meaning of the applicable policies. As courts have recognized, billing for services rendered is not a professional service but, rather, it is the effect of the service provided, not a part of the service itself. *E.g., Horizon West Inc. v. St. Paul Fire & Marine Ins. Co.,* 214 F.Supp.2d 1074, 1079 (E.D. Calif. 2002); *Hampton Med. Group, P.A. v. Princeton Ins. Co.,* 840 A.2d 915, 921, 924-925 (N.J. Super. Ct. App. Div. 2004). *See Cohen v. Empire Cas. Co.,* 771 P.2d 29 (Colo.App. 1989) (distinguishing the rendering of professional services from the business of running a professional service). Neither does such process constitute a "related act" to the furnishing or failure to furnish professional services within the meaning of the Zurich policies.

The Second Amended Complaint alleges that the Defendants' policies of reducing nursing staff while increasing the number of residents resulted in chronic understaffing at O'Hara. This

understaffing allegedly resulted in the residents not receiving the care they needed, and, concomitantly, the submission of false and fraudulent claims for payment for those residents. As with the Defendants' Medicare/Medicaid billing process argument, the Defendants' policies relate to the *business* of running a nursing facility - - i.e., how many nurses to hire or have on duty, and how many patients/residents receiving care - - not to the actual rendering of professional services.

While the Government alleges that the O'Hara residents sustained injuries caused by or because of their failure to receive sufficient or appropriate "professional [nursing] services," there is no claim made on behalf of the residents for such injuries. The Government seeks recovery based on their payments made to the Defendants for days of patient service when O'Hara was not properly staffed on those days. The Government's claims do not require proof that the failure to provide the required level of professional staffing resulted in substandard care for any of the residents.

As the applicable policies do not provide coverage for the allegations contained in any of the complaints filed in the Underlying Lawsuit, there is no basis for the Defendants' counterclaims of bad faith against Valley Forge and Lloyd's. The Insurers have no duty to defend or indemnify the Defendants in the Underlying Lawsuit and Valley Forge and Zurich are entitled to reimbursement for defense costs they have expended, subject to any challenges the Defendants may have concerning such costs. Upon the foregoing, it is

ORDERED that the plaintiffs' motions for summary judgment are granted. The respective insurance policies do not provide coverage for the allegations contained in any of the pleadings in the Underlying Lawsuit and the Defendants' motions for partial summary judgment are denied for the same reason; and it is

FURTHER ORDERED that the Defendants' counterclaims for bad faith against Valley Forge and Lloyd's are dismissed.

DATED: July 20, 2006

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge